UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

03 AUG 13 PM 3: 31

U.S. DISTRICT COURT
N.D. OF ALABAMA

DARRICK STALLWORTH,            )
                               )
        Plaintiff,             )
                               )
vs.                            )        Civil Action No. CV-02-S-1740-S
                               )
ALABAMA POWER COMPANY,         )
                               )        ENTERED
        Defendant.             )
                                        AUG 1 3 2003

## MEMORANDUM OPINION

This action is before the court on defendant's motion for reconsideration of the order

denying summary judgment or, alternatively, motion to certify an interlocutory appeal (doc.

no. 34). Upon consideration of the motion, response, and reply, the court finds that the

motion for reconsideration should be GRANTED IN PART, and the alternative motion to

certify an interlocutory appeal should be DENIED.

## I. RACE DISCRIMINATION

Defendant moves to reconsider the court's order denying summary judgment on

plaintiff's race discrimination claim. Defendant argues that plaintiff cannot identify any

similarly situated employees that were treated differently.

Plaintiff was twice employed and discharged by defendant. Plaintiff contends that his

first discharge amounted to race discrimination in violation of Title VII and 42 U.S.C. §

1981. Plaintiff complains that he was fired "for failing a test that had nothing to do with his

job performance while white employees who had also failed the test were permitted to keep

their jobs."[1]  Plaintiff further claims that defendant "discriminatorily used the test score against [plaintiff] and fired him, while permitting similarly situated white employees to retain their jobs," and "imposed more stringent educational requirements on [plaintiff] than on similarly situated white employees as criteria for the very same job."[2]  Plaintiff contends that the second discharge was in retaliation for filing this lawsuit.[3]

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the

---

[1] Amended Complaint, ¶ 23 (doc. no. 9).

[2] *Id.*, ¶ 24.

[3] *Id.*, ¶ 34.

> materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Plaintiff has presented no direct evidence of a racially discriminatory intent, and the court accordingly will evaluate this claim by application of the analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S. Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094). To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the

introduction of admissible evidence, the reasons for the [contested employment decision]."

*Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094.  If a defendant carries its burden of producing

"admissible evidence which would allow the trier of fact rationally to conclude that the

employment decision had not been motivated by [a] discriminatory animus," *Burdine*, 450

U.S at 257, 101 S. Ct. at 1096, the presumption of discrimination created by the prima facie

case "drops from the case," and "the factual inquiry proceeds to a new level of specificity."

*Id.* at 255 & n.10, 101 S. Ct. at 1094-95 & n.10.  The burden then shifts to the plaintiff to

"come forward with evidence, including the previously produced evidence establishing the

prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons

given by the employer were not the real reasons for the adverse employment decision," but

merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450

U.S. at 256, 101 S. Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825).  *Cf.*

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147

L. Ed. 2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient

evidence to find that the employer's asserted justification is false, may permit the trier of fact

to conclude that the employer unlawfully discriminated.").  If a plaintiff does so, then he or

she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529.  "The ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against

the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S. Ct. at

2106.

The Eleventh Circuit has held that a plaintiff seeking to make out a prima facie case of disparate treatment in employment under either Title VII or (as here, in a claim based upon the plaintiff's race) 42 U.S.C. § 1981, must generally show that: (1) he is a member of a protected class of persons, such as a racial minority; (2) he was subjected to an adverse employment action (*e.g.*, his employment was terminated); (3) the employer treated similarly situated employees outside his protected class more favorably; and (4) he was qualified to do the job from which he was fired. *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Brown v. American Honda Motor Company, Inc.*, 939 F.2d 946, 949 (11th Cir. 1991) (observing that "[t]he Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases") (citations omitted).  Defendant's motion for reconsideration is due to be granted, and summary judgment entered in favor of Alabama Power Company, because plaintiff failed to satisfy the third element of a prima facie case.

Plaintiff first was employed by defendant in 2001, as a Field Forces Helper in Substation Construction.  Eight employees in Substation Construction were required to go through defendant's training program and to pass the so-called Module I written test by achieving a score of 70% or higher, as a condition of continued employment.[4]  Plaintiff

---

[4] *See* Defendant's Evidentiary Submission, Wilson Declaration (Tab 12).

completed the required training program, but twice failed the Module I written test.[5]  No

helper has ever failed the Module I written test twice.[6]  The highest score on the test was

made by Paul Smitherman, an African American male.[7]  Plaintiff was discharged for failing

to meet a condition of his employment. He responds to these facts by asserting that: he is

a good employee; no other division was required to pass this test; and the test had no relation

to the job plaintiff was required to perform.[8]  Plaintiff failed, however, to present any

evidence that similarly situated employees outside his protected class were treated

differently. This is fatal to establishing a prima facie case of discrimination. *See, e.g., Abel

v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000) ("Absent some other similarly situated

but differently disciplined worker, there can be no disparate treatment.").

Accordingly, the court's June 13, 2003 Order denying summary judgment is vacated

in part, defendant's motion for reconsideration and motion for summary judgment is granted

in part, and plaintiff's race discrimination claim is dismissed with prejudice.

## II. RETALIATION

The court nevertheless stands firm on its previous decision to deny summary judgment

on plaintiff's retaliation claim.  Generally speaking, a plaintiff must prove three elements to

---

[5] *Id.*

[6] Only one individual, a white female, other than plaintiff failed the Module I test.  Both were given a second chance to take the exam.  Plaintiff is the only person to have failed the test a second time.  *See id.* (Wilson Declaration).

[7] *Id.*

[8] *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (doc. no. 26) at 18-20.

establish a prima facie case of retaliation: (1) he engaged in statutorily protected expression;[9]

(2) he suffered an adverse employment action; and (3) there was a causal linkage between

the protected conduct and the adverse employment action. *See, e.g., Bass v. Board of County*

*Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta v. Florida Board of Regents*,

212 F.3d 571, 587 (11th Cir. 2000).[10]

> Once the plaintiff makes out a prima facie case, "the burden shifts to the
> defendant to rebut the presumption of retaliation by producing legitimate
> reasons for the adverse employment action." If the defendant offers legitimate
> reasons, the presumption of retaliation disappears. The plaintiff must then
> show that the employer's proffered reasons for taking the adverse action were
> actually a pretext for prohibited retaliatory conduct.

*Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999)

(quoting *Raney v. Vinson Guard Service*, 120 F.3d 1192, 1196 (11th Cir.1997)) (citations

omitted); *see also, e.g., Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). In

determining pretext, the court must evaluate whether the plaintiff has demonstrated "such

---

[9] "Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

[10] Even though the text of 42 U.S.C. § 1981 does not contain a specific prohibition against retaliation, the Eleventh Circuit has held that retaliation claims asserted in the context of a complaint of racial discrimination, and arising after the effective date of the Civil Rights Act of 1991, generally are cognizable under that statute. *See, e.g., Webster v. Fulton County, Georgia*, 283 F.3d 1254, 1256 (11th Cir. 2002) (holding that "[w]e have previously concluded that Section 1981 supports a retaliation cause of action") (citing *Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1409-13 (11th Cir. 1998)). In the absence of direct evidence of an intent to retaliate, both Title VII and § 1981 require a plaintiff to comply with the *McDonnell Douglass* analytical framework in order to survive a motion for summary judgment. *See Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis); *Moss v. W & A Cleaners*, 111 F. Supp. 2d 1181 (M.D. Ala. 2000); *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 1176, 1185 (N.D. Ala. 1999).

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that reasonable factfinder could find them unworthy of credence." *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir.) (citation and internal quotation marks omitted), *cert. denied*, 534 U.S. 976, 122 S. Ct. 402, 151 L. Ed. 2d 305 (2001).

Defendant makes two arguments in its motion for reconsideration on the retaliation claim. First, defendant argues that plaintiff failed to establish the causation element of the prima facie case. Second, defendant argues that plaintiff presented no evidence of pretext.

In order to establish the requisite causation element, a plaintiff "need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (quoting *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564-1571-72 (11th Cir. 1993); *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990); *Simmons v. Camden County Board of Education*, 757 F.2d 1187, 1189 (11th Cir. 1985). Plaintiff must generally establish that defendant was actually aware of his pending lawsuit alleging race discrimination at the time defendant terminated his employment. *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997).

> Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected [conduct] and acted within the scope of his or her agency when taking the action.

*Id.*

8

The following facts are relevant to the issue of whether defendant was aware that plaintiff had commenced this action on the date it terminated his employment for the second time. Defendant originally terminated plaintiff's employment as a Field Forces Helper during November of 2001, following his second failure to post a passing score on the Module I test. After that termination, plaintiff discussed his concerns about racism with defendant's corporate recruiter, Stephanie Player.[11] Player told plaintiff that defendant was hiring Plant Helpers.[12] Plaintiff submitted an application on February 6, 2002.[13]

One month later, on March 12, 2002, plaintiff filed a charge with the EEOC, accusing defendant of discrimination on the basis of race when terminating his employment as a Field Forces Helper.[14]

The EEOC issued a right to sue letter on June 11, 2002, which indicates that Glenda M. Dicks, of defendant's Ethics and Business Practice department, was aware of plaintiff's charge of discrimination.[15]

McNeal called plaintiff and offered him a job as Plant Helper, and confirmed the verbal offer (and plaintiff's oral acceptance) in writing, on July 15, 2002, contingent upon plaintiff passing a background check and drug screen.[16]

---

[11] *See* Defendant's Evidentiary Submission, Stallworth Depo. at 73-75 (Tab 1).

[12] *Id.* at 70.

[13] Def. Exhibit 8 attached to Stallworth Deposition.

[14] Def. Exhibit 7 attached to Stallworth Deposition.

[15] *See* Notice of Right to Sue attached to Plaintiff's Motion for Leave to Supplement His Evidentiary Submission (doc. no. 25).

[16] *See* Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (Tab 29).

Plaintiff filed the complaint commencing this action on July 17, 2002.[17]

A background investigation revealed that plaintiff had been placed on probation after pleading guilty in state court to the misdemeanor offense of negotiating a worthless instrument ("bad check").[18] When the results of a background investigation conflict with the information contained in a person's application for employment, the background-check report and application for employment are forwarded to defendant's senior investigator in corporate security, Robyn Vance.[19]

Vance telephoned plaintiff on July 26, 2002, and asked him why he had not disclosed information about the misdemeanor conviction and probationary sentence on his application for employment.[20] Plaintiff explained that: he had closed the checking account before a check cleared; he did not receive notice about the "bounced" check because, at the time, he was on assignment for defendant in south Alabama; he repaid the bank the full amount of its loss when he learned of the situation; and, he had not realized he actually had been convicted of a crime.[21]

Vance prepared a report on July 29, 2002, focusing on two issues: plaintiff's eligibility for re-hire and his conviction and probation.[22] Vance e-mailed her report to

---

[17] Doc. no. 1.

[18] See Plaintiff's Evidentiary Submission (Tab 5)

[19] See Defendant's Evidentiary Submission, Vance Depo. at 29-30 (Tab 4).

[20] Id. at 24-25.

[21] See Plaintiff's Evidentiary Submission (Tabs 1 and 2); Defendant's Evidentiary Submission, Stallworth Depo. at 111-14 (Tab 1).

[22] See Plaintiff's Evidentiary Submission (Tab 3).

McNeal, McNeal's assistant Cheryl Garner, senior staffing analyst **Dana Hubbard**, manager of corporate security Randy Mayfield, and Vance's assistant investigator Ronald Buford.[23] Mayfield e-mailed Vance within thirty minutes, copying Hubbard, Garner, McNeal and Buford, saying, "Hold the phone – it looks like it is possible that not indicating 'ineligible for rehire' in SHIPS [*i.e.*, the human resources electronic database in which employee information is stored] for the termination of Mr. Stallworth could have been an oversight."[24] In other words, Mayfield's stated concern did not directly implicate either plaintiff's state misdemeanor conviction and probationary sentence, or his failure to disclose that information in his application for employment.

McNeal checked with Stephanie Player, the person who referred plaintiff to him, and asked: "Do you see any reason – they're wanting to make sure that he is eligible for rehire."[25]  Player responded "no."[26]  McNeal further testified that after receiving and reviewing Vance's report, he concluded that things like bad check charges happen, and that he would not hold the conviction against plaintiff.[27]  McNeal also testified that he was not

---

[23] *See id.* (Tab 2); Defendant's Evidentiary Submission, Vance Depo. at 18-21 (Tab 4).

[24] *See* Plaintiff's Evidentiary Submission (Tab 6).

[25] Defendant's Evidentiary Submission, McNeal depo. at 53:12-14 (Tab 5).

[26] *Id.* at 53:16.

[27] McNeal explained:

A.    And this is pretty much common.  When we get a report back, if there is an issue or something, we look over it.  You know, if somebody forgot to do a speeding ticket or something, like that, you know, we make a judgment call at that point, make a lot of judgment calls in that case.

In this case, if you look down where it talks about the worthless checks and such, didn't disclose it, hadn't been convicted, the charge stems from having closed out

11

aware that plaintiff was on probation; he overlooked the references to probation in Vance's report.[28]

Plaintiff reported to work for defendant in August of 2002.

Defendant filed an answer to the complaint on August 22, 2002.[29]

Defendant maintains that it made the decision to terminate plaintiff on September 26, 2002, immediately after **Dana Hubbard** discovered during an audit that plaintiff was on probation, and that this fact had not been disclosed on plaintiff's second application for employment.[30]

September 26, 2002 is the critical date, because plaintiff alleges that defendant's counsel discovered that defendant had rehired plaintiff during the parties' planning meeting pursuant to court order on September 27, 2002.[31]  Plaintiff further claims that defense

---

a checking account at his credit union.  See that a lot, see that a lot.  So I looked at that and took into account what, you know, had been said, which I think, you know, was just kind of one of those things that happens.

Q.      Sure.

A.      So didn't hold that against him and made the decision to go ahead and have him come in.  I do not consult with people at the plant.  At that point, we feel that, you know, we have the knowledge and, you know, we see it all the time, so we can look from past practices and make the best decision.

McNeal Depo. at 54-55.

[28] *Id.* at 58.

[29] *See* Answer (doc. no. 4).

[30] *See* Defendant's Memorandum of Law in Support of its Motion for Summary Judgment at 13 (doc. no. 20).

[31] *See* Amended Complaint at 4, ¶ 19.

counsel, upon learning of plaintiff's rehire, directed defendant to discharge him.[32]

September 26, 2002 also is critical in this respect: defendant maintains that those persons making the decision to terminate plaintiff were not made aware of his pending lawsuit until September 27, 2002, at the earliest. A close examination of the summary judgment evidence, however, leads the court to conclude that a material fact dispute exists with respect to the causation element which precludes summary judgment.

Dana Hubbard declares that she discovered in September of 2002 that plaintiff was ineligible for employment because of a willful omission of information concerning his criminal conviction and probationary sentence on his application for employment.[33] Hubbard further claims that she "*immediately*" telephoned Judy Dewberry, team leader for Staffing.[34] According to Hubbard, she and Dewberry agreed that plaintiff should not have been rehired.[35] No specific date was mentioned in Hubbard's declaration, but Judy Dewberry's declaration reflects that this conversation occurred on Thursday, September 26, 2002.[36]

Although Hubbard claims she did not discover that plaintiff was on probation until September, the record reveals that Hubbard was copied on an e-mail from Vance on July 29, 2002, attaching her report on the investigation of plaintiff which discusses his probation and eligibility for rehire. Mayfield responded to Vance's e-mail, also copying Hubbard.

---

[32] *See* Defendant's Evidentiary Submission, Stallworth Depo. at 136 (Tab 1).

[33] *See* Defendant's Evidentiary Submission, Declaration of Dana Hubbard (Tab 11).

[34] *Id.* (emphasis supplied).

[35] *Id.*

[36] *See* Defendant's Evidentiary Submission, Declaration of Judy Dewberry (Tab 10).

Dewberry states in her declaration that:

> Immediately following my telephone conversation with Mrs. Hubbard, I called
> Tom McNeal, the recruiter that hired [plaintiff], to my office.  I told Mr.
> McNeal that we had hired someone that should not have been hired given the
> investigation report on [plaintiff] and pointed out that it showed [plaintiff] was
> on probation for a bad check charge.  Mr. McNeal admitted that he knew the
> company policy concerning hiring someone on probation, but could not
> explain how [plaintiff's] information got past him.  I asked Mr. McNeal to
> speak with David Edge about the situation and explain where we were.  Mr.
> McNeal later came to my office and told me that he had spoken with Mr. Edge
> and Bethany Bankowski, and that [plaintiff] was not going to be at work until
> the following Monday and that his employment would be terminated when he
> returned.[37]

Dewberry further declared that the "first time that I heard anything about Mr. Stallworth

having filed a charge of discrimination or a lawsuit against Alabama Power company was

on September 27, 2002."[38]  Plant manager, Jimmy Wayne Cook, stated in his declaration that

on September 26th, he was informed by Joel Durrett, assistant plant manager, that an audit

performed by Staffing on plaintiff's background revealed they hired someone who should

not have been hired and that his employment should be terminated.[39]  Cook instructed Durrett

to carry out the termination when plaintiff returned to work on September 30.[40]  At the time

Cook made the decision to terminate plaintiff, he was not aware that plaintiff had filed a

charge of discrimination or a lawsuit against defendant.[41]  This is the evidence on which

defendant relies to establish that the final decision to terminate was made on September 26th,

---

[37] *Id.* at ¶ 4.

[38] *Id.* at ¶ 5.

[39] *See* Defendant's Evidentiary Submission, Declaration of Jimmy Wayne Cook (Tab 9).

[40] *Id.*

[41] *Id.*

14

and that the decision maker[42] was not aware of the pending lawsuit until after the final decision had been made.

Other evidence, however, contradicts that a final decision was made on September 26th, and that Dewberry did not find out about plaintiff's pending charge and lawsuit until September 27th. Plaintiff was terminated on September 30, 2002. On that date, Bethany Bankowski sent an e-mail to Jimmy Cook, Joel Durrett, and John Woods memorializing the events leading up to plaintiff's termination.[43] Bankowski's e-mail states that she was instructed on September 26th to terminate plaintiff (also suggesting that the decision maker was Dewberry and not Cook).[44] Bankowski's e-mail ends with the suggestion that after speaking to the union president, Roy Green, "we may need to ask more info about what happened when [plaintiff] was employed with Power Delivery."[45] When McNeal was asked in his deposition why, if the decision had been made to terminate plaintiff because he was on probation, would there be any interest or discussion concerning plaintiff's employment with Power Delivery, he responded: "That's a good question. I have no idea. I'm not real familiar with union stuff or why, so I'm not sure."[46]

---

[42] Although Jimmy Wayne Cook states in his declaration that he made the decision to terminate plaintiff, he also states in his declaration that he was told plaintiff had to be terminated by his assistant manager, who was relaying information from Staffing. Thus, it is unclear from the evidence who is the decision maker, as both Cook and Dewberry appeared to take an active role in the decision to terminate plaintiff. Further, an e-mail from Bethany Bankowski written on September 30, 2002, indicates that she "was instructed to terminate [plaintiff] and notify Dana Hubbard when the termination occurred." Plaintiff's Evidentiary Submission (Tab 8). The instruction came from Staffing. *Id.*

[43] *See id.*

[44] *See id.*

[45] *Id.*

[46] Defendant's Evidentiary Submission, McNeal depo. at 73 (Tab 5).

McNeal also testified in his deposition that, after talking with Bethany Bankowski, he received a phone call from Steve Fleming asking why plaintiff was still active in the SHIPS system.[47] Fleming relayed to McNeal that plaintiff had a lawsuit pending against defendant.[48] McNeal responded, "Well, that's odd, because we're just getting ready to let him go in the position he's in now. . . It sure is kind of weird."[49] McNeal asked Fleming whether he should make his supervisor, Dewberry, aware of the lawsuit. According to McNeal, Fleming responded that Dewberry should be kept in the loop, so McNeal mentioned it to Dewberry.[50] It is not clear from McNeal's deposition when he spoke to Dewberry, but his notes of the circumstances surrounding plaintiff's termination, written within a few days of termination, reveal the following: "I told Steve [Fleming] that I wanted to make my boss, Judy Dewberry aware of the situation and I went to talk with her. After explaining to her the conversation with Steve, Judy talked with Steve."[51] Interestingly, Dewberry's contemporary notes reflect that Fleming informed her of plaintiff's pending lawsuit on September 27, 2002.[52] Dewberry does not mention in either her contemporary notes or her declaration that McNeal also informed her of plaintiff's pending lawsuit. It appears, however, that McNeal mentioned the existence of plaintiff's lawsuit prior to Dewberry speaking to Fleming.

---

[47] *Id.* at 88, 93.

[48] *Id.* at 89.

[49] *Id.*

[50] *Id.* at 89-90.

[51] *See* Plaintiff's Evidentiary Submission, Notes on Stallworth Termination attached to Bankowski e-mail dated October 3, 2002 (Tab 37).

[52] *Id.*

In summary, the evidence that a final decision to terminate was made on September 26, 2002 is far from clear. It appears that a number of people had to be consulted, and it is unclear at what point the decision became "final." The only certainty is that plaintiff was terminated on September 30, 2002 — well after defendant was aware that plaintiff had a charge of discrimination and lawsuit pending against it. Moreover, and related to the previously observed factual discrepancy, there appears to be some conflict in the evidence regarding whether Dewberry was informed about plaintiff's pending lawsuit before a final decision was made to terminate plaintiff.

The aforementioned evidence also serves to create a fact dispute with respect to pretext. Although Hubbard claims to have immediately informed Dewberry once she discovered during a monthly audit that plaintiff was on probation, she arguably was made aware of the probation two months earlier, when she was transmitted a copy of Vance's investigation report. Dewberry states that Fleming made her aware of plaintiff's charge of discrimination and lawsuit on September 27, 2002, but makes no mention of the fact that McNeal also informed her of the lawsuit before Fleming.

Finally, the summary judgment evidence raises questions as to whether being on probation for a minor misdemeanor conviction is a terminable offense.[53] Defendant was

---

[53] The court also notes that defendant vacillates on the reason for termination stating either it was because plaintiff was on probation or because plaintiff omitted the probation on his application. *Compare* Plaintiff's Evidentiary Submission (Tab 7) (E-mail from John Woods to Bethany Bankowski, Sept. 30, 2002, 2:59 p.m.) *with* Plaintiff's Evidentiary Submission (Tab 31) (termination letter). Plaintiff explained during the investigation that he did not realize he had been convicted of a crime, so he did not willfully omit any information. Defendant's Evidentiary Submission, Stallworth depo. at 111-14 (Tab 1).

aware of plaintiff's probation, as reflected in the investigation report of Vance in July 2002.[54] Defendant nonetheless hired plaintiff.  Defendant's written policy regarding background investigation guidelines does not mention "probation" as a ground for disqualification from employment.[55]  The written policy does provide the following:  *"In applying these guidelines, the Company will consider the nature of the conviction, the time of the conviction, evidence of rehabilitation and the nature of the position for which the individual is being considered."*[56]  This seems to indicate there is discretion in hiring someone who is on probation.  Plaintiff's supervisor, John Woods, was instructed by Bankowski to terminate plaintiff.[57]  In an e-mail memorializing the events of plaintiff's termination, Woods wrote that he called plaintiff to his office and told him:  "As of right now, it's the Company Policy that we don't hire anyone that's on probation and I'm terminating your employment with the Company."[58]  Later that day, Bankowski changed that sentence in Wood's e-mail to read: "As of right now,  the info would have kept us from hiring him and I'm terminating your employment with the Company."[59]  There is sufficient evidence to challenge defendant's stated reason for terminating plaintiff a second time as a pretext for retaliation.  Thus, defendant's motion for summary judgment on the retaliation claim must be denied.

---

[54] *See* Plaintiff's Evidentiary Submission (Tab 3) (Investigation Report).

[55] *See id.* (Tab 34) (Background Investigation Guidelines).

[56] *Id.* at Bates #296 (emphasis supplied).

[57] *See id.* (Tab 7) (E-mail from John Woods to Bethany Bankowski, Sept. 30, 2002, 2:59 p.m.).

[58] *Id.*

[59] *See* Plaintiff's Evidentiary Submission (Tab 9) (E-mail from Bethany Bankowski to John Woods, Sept. 30, 2002, 4:34 p.m.).  The e-mail begins: "john, made a few changes . . . . .let me know if this still correctly reflects your conversation."

### III.  INTERLOCUTORY APPEAL

Certification for interlocutory appeal is not even remotely appropriate in the instant case.  A district court may certify an interlocutory appeal from an order that "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  The legal principles involved in this summary judgment proceeding are well established and not subject to a difference of opinion.  The matter is mired in factual controversy and does not involve a controlling question of law.  Accordingly, the request for certification of an interlocutory appeal is due to be denied.

### IV.  DISQUALIFICATION OF COUNSEL

Although plaintiff has not sued counsel for defendant, it is apparent that plaintiff is alleging some complicity by counsel in the decision to terminate plaintiff for a second time.  Rule of Professional Conduct 3.7 provides:

> (a)  A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness, except where:
>
> > (1)  the testimony relates to an uncontested issue;
> > (2)  the testimony relates to the nature and value of legal services rendered in the case; or
> > (3)  disqualification of the lawyer would work substantial hardship on the client.
>
> (b)  A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness, unless precluded from doing so by Rule 1.7 or Rule 1.9.

19

During plaintiff's deposition, the implication of Rule 3.7 became apparent.[60]  Accordingly,

counsel for plaintiff is ordered to file a brief outlining whether he and/or counsel for

defendant should be disqualified for purposes of the trial of plaintiff's retaliation claim.

Plaintiff's brief is due on or before Friday, August 22, 2003.  Defendant shall file a response

on or before Friday, August 29, 2003.

---

[60] *See* Defendant's Evidentiary Submission, Stallworth depo. at 139-142 (Tab 1):

| | |
|---|---|
| Q. | Now, you weren't at this meeting between your lawyer and I [sic] on September 27th, were you? |
| A. | No. |
| Q. | So you don't know anything about what was discussed? |
| A. | I had a brief on it, a little bit. |
| Q. | Okay.  Your lawyer tell you about it? |
| A. | Yeah, a little bit. |
| Q. | When did he tell you about that meeting? |
| A. | I think that Monday after I called him and told him what had happened. |
| Q. | And what did he tell you? |
| Mr. Acker: | Well, I object to the form of that.  Instruct you not to answer.  It's covered by attorney-client privilege. |
| Mr. Pope: | Well, I think that the fact that you're basing part of this case on that meeting, I think that – and also the fact that he's already gotten into a lot of this.  I don't think it is privileged.  I mean you're – are you going to testify in this case about the meeting – |
| Mr. Acker: | I don't know.  Maybe you're going to testify. |
| Mr. Pope: | I ain't going to testify about squat.  But I'm asking you: Are you planning on testifying about the meeting?  I mean, my position is that I don't think it's privileged, if he's basing his lawsuit on that fact.  Are you still instructing him not to answer? |
| Mr. Acker: | Yeah, because what you're doing is asking about a conversation that he and I've had. |
| Mr. Pope: | That's exactly right.  But that's what he's basing his retaliation claim on. |
| Mr. Acker: | Not our conversation. |
| Mr. Pope: | Well, that's what the pleading and the complaint says, that it's based on this meeting wherein counsel for Alabama Power was informed that he was still working. |
| Mr. Acker: | That's just the facts.  I mean it – |
| Mr. Pope: | Well, are you maintaining that you don't want him to answer the question? |
| Mr. Acker: | Yeah. |
| Mr. Pope: | Okay. |
| Mr. Pope: | We'll move forward, but I'm leaving the deposition open in case we need to address that issue again. |

## V. CONCLUSION

Accordingly, the motion for reconsideration is GRANTED IN PART, and the court's June 13, 2003 Order is VACATED IN PART.  The defendant's motion for summary judgment (doc. no. 19) is GRANTED with respect to the race discrimination claim, but is DENIED with respect to plaintiff's retaliation claim.  Defendant's alternative motion to certify an interlocutory appeal is DENIED.  An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this _13th_ day of August, 2003.

United States District Judge